UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

REGINA L. CLARK,

     Plaintiff,

v.                                      Case No. 5:17cv184-CJK

NANCY A. BERRYHILL, Acting
Commissioner of the Social Security
Administration,

     Defendant.

_____/

## MEMORANDUM ORDER

This matter is before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Regina L. Clark's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-34. The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c) and FEDERAL RULE OF CIVIL PROCEDURE 73 for all proceedings in the case, including entry of final judgment. Upon review of the record before the court, I conclude the findings of fact and determinations of the Commissioner are supported by substantial evidence. The decision of the Commissioner, therefore, will be affirmed and

plaintiff's application for benefits will be denied.

## ISSUES ON REVIEW

Ms. Clark, who will be referred to as claimant, plaintiff, or by name, challenges the ALJ's assessment of residual functional capacity ("RFC"). Specifically, she argues the ALJ erred in (1) giving insufficient weight to the opinions of her treating physician and too much weight to the opinions of non-treating physicians, and (2) finding her not entirely credible.

## PROCEDURAL HISTORY

Ms. Clark filed an application for DIB on October 10, 2013, alleging disability beginning October 1, 2013, due to lumbar spinal fusion with continued constant pain and depression. T. 234-48.[1] She later amended the onset date to January 1, 2014. T. 22, 40. Her claim was denied initially and on reconsideration. T. 234, 257-61. Ms. Clark appeared for a hearing before an Administrative Law Judge ("ALJ") on February 4, 2016. T. 38-66. Less than a week after the hearing, the ALJ elicited an opinion from Eric Schmitter, M.D., through interrogatories. T. 1205-14. On June 8, 2016, the ALJ issued a decision denying Ms. Clark's application for benefits. T. 22-

---

[1] The administrative record, as filed by the Commissioner, consists of 19 volumes (docs. 11-1 through 11-19) and has 1284 consecutively numbered pages. References to the record will be by "T.," for transcript, followed by the page number.

Case No. 5:17cv184-CJK

32.  Ms. Clark petitioned the Appeals Council for review of the ALJ's decision.  T. 1-6, 316-17, 426-31.  The Appeals Council denied the request.  T. 1-6, 317.  The ALJ's decision thus became the final determination of the Commissioner.

FINDINGS OF THE ALJ

In  her written decision, the ALJ made a number of findings relevant to the issues raised in this appeal:

- "The claimant meets the insured status requirements of the Social Security Act through December 31, 2018."  T. 24.

- "The claimant has not engaged in substantial gainful activity since January 1, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*)."  T. 24.

- "The claimant has the following severe impairments: status-post lumbar fusion and post-laminectomy syndrome (20 CFR 404.1520(c))."  T. 24.

- "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)."  T. 26.

- "After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she could only occasionally perform postural maneuvers." T. 27.

- "The claimant is capable of performing past relevant work as a clerk, general office. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565)." T. 31.

- "The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2014, through the date of the decision (20 CFR 404.1520(f))." T. 31.

## STANDARD OF REVIEW

A federal court reviews the "Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (*quoting Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

When reviewing a Social Security disability case, the court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)); *see also Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015) ("In determining whether substantial evidence supports a decision, we give great deference to the ALJ's factfindings.") (*citing Black Diamond Coal Min. Co. v. Dir., OWCP*, 95 F.3d 1079, 1082 (11th Cir. 1996)). A reviewing court also may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on

by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). Review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d 1273 (11th Cir. 1985).[2]

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* § 423(d)(2)(A). To be eligible for disability benefits, a claimant must prove she became disabled prior to the expiration of her date last insured. *See* 42 U.S.C. §§ 416(i)(3), 423(a) and (c); 20 C.F.R. §§ 404.101, 404.130, 404.131; *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

---

[2] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

Pursuant to 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the Commissioner analyzes a disability claim in 5 steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3. If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least 12 months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent her from performing her past relevant work, she is not disabled.[3]

5. Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates the claimant's residual functional capacity and vocational factors, she is not disabled.

---

[3] Claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. *Chester v. Bowen*, 792 F. 2d 129, 131 (11th Cir. 1986).

Case No. 5:17cv184-CJK

Step 5 (or step 4 in cases in which the ALJ decides a claimant can perform past work) is generally where the rubber meets the road. At that point, the ALJ formulates the all-important residual functional capacity ("RFC"). The ALJ establishes RFC, utilizing the impairments identified at step 2, by interpretation of (1) the medical evidence; and (2) the claimant's subjective complaints (generally complaints of pain). Residual functional capacity is then used by the ALJ to make the ultimate vocational determination required by step 5.[4] "[R]esidual functional capacity is the most [a claimant] can still do despite [claimant's] limitations.[5] 20 C.F.R. §§ 404.1545(a)(1),

---

[4] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.) We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps." 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[5] In addition to this rather terse definition of RFC, the Regulations describe how the Commissioner makes the assessment:

(3) Evidence we use to assess your residual functional capacity. We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity. (See § 416.912(c).) However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources. (See §§ 416.912(d) through (f).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 416.913.) We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends or other persons. (See paragraph (e) of this section and § 416.929.)[.]

20 C.F.R. § 416.945(a)(3).

Case No. 5:17cv184-CJK

416.945(a)(1).  Often, both the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict and that conflict leads, as in this case, to the points raised on judicial review by the disappointed claimant.

## FACT BACKGROUND[6]

Ms. Clark was 50 years old on the amended alleged onset date of January 1, 2014, and 52 years old at the time of the ALJ's decision.  T. 41.  She completed high school and was a clerk for the Jackson County Health Department from 1993 to 2013.  T. 41-42.  Ms. Clark quit working because she "was not able to work, you know, and function with the medication and the pain."  T. 50.  Her job required her to travel to at times, "a little over an hour," and she "would have to get in the backseat and lay down while" someone else drove.  T. 50.  She then had a "long walk . . . and a lot of sitting."  T. 50.  She tried working part-time to maintain health insurance, but "[b]ecause of the medication and the pain . . . [she] would have to come home and lay down for the rest of the day."  T. 50-51.

---

[6] The medical and historical facts of this case, as set out below, were derived primarily from plaintiff's testimony at the hearing and also the administrative record.

Case No. 5:17cv184-CJK

Ms. Clark explained she had 2 surgeries – one in 2011 and another in 2012 – the latter of which involved the insertion of 2 rods and 6 screws in her back. T. 45. She said she has "extreme pressure in [her] low back" that "feels like . . . a blob hanging from the bottom of [her] spine." T. 45. As a result of the last surgery, Ms. Clark has nerve damage in her legs, with which she struggles daily. T. 45. She said she can no longer go on family outings or vacations and explained that "[b]y the time we would get there, I would have to stay in the bed, and they would go off doing, you know, good, fun things. But I would have to stay in the motel room." T. 60.

Ms. Clark takes Percocet and Lyrica. T. 47. She said Percocet relieves her pain "for a little while," but she has to "lay down, basically, when [she] take[s] the medication . . . on heat or ice" because "it makes [her] real nauseous – nauseous, and, you know, a little jittery-like . . ." T. 47. She also said it makes her "a little bit more agitated." T. 47. Lyrica, on the other hand, makes her "a little sleepy." T. 47.

Ms. Clark has difficulty standing and walking less than 2 hours a day and has to limit her activities. T. 50-52. She said she can either stand or walk before having to change positions "[p]robably 10 minutes," which "would be the max." T. 48. She said she uses a cane around the house and when she goes out alone, at the recommendation of the doctor who performed her back surgeries. T. 57. With regard

to sitting, she said if she "could shift around, you know, and keep a pillow to keep the pressure off the bottom of [her] spine, [she] could sit maybe 20 minutes . . . at the max." T. 48. Ten "pounds would be the max [she] would even attempt to lift," but she does not "attempt to do that." T. 49.

When asked about her pain level, Ms. Clark said it is an 8 or 9 when she gets up in the morning. T. 57. "Even with medication, [she] probably [stays] a 5. The medication only lasts about four hours – four to six at the most before [she has] to take more. But by that time, [she has] to lay down." T. 57. And she must rest in the interim. T. 57. She said her pain level never decreases below 4. T. 57-58. She "go[es] to bed hurting, and [she] get[s] up hurting. It wakes [her] up during the night – [her] legs do, with pain, and the sharp pain in [her] low back will wake [her] up." T. 58. In addition to heat and cold, water helps relieve the low back pain. T. 58. Ms. Clark estimated she lays down "[p]robably six hours of the eight . . . you know, during the day" – typically on the sofa, although she lies in the bed after 2:00 p.m. to "hopefully catch a nap," which she does daily for an hour and a half to 2 hours. T. 58-59. Although she gets 6 to 8 hours of sleep a night, she said it is not restful sleep. T. 59.

A vocational expert, James D. Flynn, testified at the hearing. T. 61. Mr. Flynn testified Ms. Clark's work history includes light, semi-skilled work. T. 61. The ALJ asked Mr. Flynn to assume an individual with the same work history and educational background as Ms. Clark who can "occasionally bend, climb, stoop, crawl, et cetera." T. 61-62. The ALJ then asked whether "at medium, with those restrictions, would she been [sic] able to return to the work that she previously did?" T. 62. Mr. Flynn responded "Yes." T. 62. The ALJ asked if that would be true of light work as well. T. 62. Again, Mr. Flynn responded "Yes." T. 62. The ALJ then asked if the same would be true "at sedentary with the occasional bending and so forth." T. 62. Mr. Flynn said "Yes" and identified the following "sedentary . . . unskilled, entry-level, routine, simple-task jobs" such an individual could perform: call-out operator, tube operator, and addresser. T. 62-63. The ALJ next asked "if the individual is unable to lift her arms above her head, would that interfere with her ability to do the work she previously did?" T. 63. Mr. Flynn responded "No" and said it also would not interfere with the ability to do the jobs he identified. T. 63. For the fifth hypothetical, the ALJ asked "if the individual would be off task for at least 15 percent of the day, either because pain or fatigue or the need to lie down interferes with her

ability to concentrate, would there by any work that she could do?" T. 63. Mr. Flynn replied "No, Your Honor." T. 63.

Plaintiff's counsel asked Mr. Flynn if Ms. Clark would be able to maintain employment if she had to miss 4 or more days of work per month due to her physical condition and/or treatment of her condition. T. 64. Mr. Flynn responded in the negative. T. 64. When asked whether there would be jobs she could perform if required to take unscheduled breaks every hour of the working day to lie down, Mr. Flynn said "No." T. 63. He also said there would be no work Ms. Clark could perform if she was limited to sitting only 2 hours during an 8-hour work day and less than 1 hour of combined standing and walking. T. 63. Finally, Mr. Flynn testified that if required to take a 1.5 hour nap during the work day, Ms. Clark would be unable to maintain employment. T. 63.

Turning to Ms. Clark's medical history, Dr. James McGrory performed an L3-4 and L4-5 decompression in December 2011, which resulted in some relief, but Ms. Clark continued to have "severe ongoing pain" and some continuous radicular symptoms associated with degenerative disc disease. T. 496, 660, 742, 785-86. On December 7 and 12, Dr. McGrory performed lumbar fusion surgery from L3 through S1. T. 493, 496. Dr. McGrory also treated Ms. Clark for residual, post-surgical

lumbar pain.  T. 465-92.  In July 2013, he limited her to "Light Duty 2-3 days a week.  No bending, stooping, climbing.  No pushing, pulling or lifting > 10lbs. Limited travel 45 mile max."  T. 469.

On November 12, plaintiff reported continued "neurogenic type pain in the L5 nerve root distribution."  T. 604.  Dr. McGrory reviewed the lumbar CT myelogram and diagnosed displacement of lumbar intervertebral disc without myelopathy; lumbago; and sciatica (right L5).  T. 604.  He noted plaintiff "has essentially 2 failed back operations with chronic neurogenic pain" and opined she was not "going to be able to continue to work in her usual capacity in the medical field given her pain."  T. 604.  He stated he would "wholeheartedly agree with her [to retire] for medical reasons."  T. 604, 695.  Also in November 2013, plaintiff sought pain management treatment with John Marsella, M.D.  Dr. Marsella administered a right L5 steroid injection and prescribed Meloxicam, Methocarbamol, Ultram, Neurontin, and Percocet.  T. 558-62.

Ms. Clark returned to Dr. McGrory on January 6, 2014, complaining of ongoing right L5 nerve root pain, radiating from her lower back into her legs.  T. 598-99.  Dr. McGrory noted tenderness over L5-S1, decreased sensation of the lateral leg and thigh, and numbness of the feet.  T. 599.  He continued plaintiff on Celebrex,

Lyrica, Percocet, and Soma and opined plaintiff "continues to be disabled completely from the gainful employment standpoint." T. 599.

Plaintiff again saw Dr. Marsella on January 30, 2014, complaining of pain that she rated at 7 out of 10, which was moderate to severe. T. 552-53. She indicated improvement for only 2 to 4 days after the steroid injection and that she was taking Lyrica, Soma, and Endocet. R. 552-53. She reported "she doesn't really like to take [pain medication] and therefore uses it sparingly." T. 553. The same was true with regard to muscle relaxants. T. 553. Dr. Marsella noted normal gait, no tenderness, and a bilaterally positive straight leg raise. T. 555. A lumbar CT and MRI revealed postoperative changes and loosening of S1 screws with mild disc bulges at L4-5 and L5-S1, the latter extending into the neural foramen "without significant encroachment." T. 55-56. Dr. Marsella increased the Lyrica dosage and suggested a spinal cord stimulator. T. 556. Later that day, plaintiff took a Physical Performance Test, after which physical therapist Chelsea Mills opined plaintiff would have occasional or moderate limitation in sitting, standing, and walking in an 8-hour day. T. 980-81.

Plaintiff returned to Dr. McGrory on March 25, 2014, complaining of low back, bilateral leg, and foot pain and stating she "went to pain management and feels they

just gave her medication that made her drowsy." T. 594. She reported no difficulty walking or climbing stairs, dressing or bathing, or doing errands alone. T. 594. She also said she was not able to tolerate Lyrica. T. 595. Dr. McGrory indicated plaintiff had a "difficult problem with no easy solution" and continued the medications. T. 595. An April 2, 2014, CT of the lumbar spine indicated postoperative changes with no "concentric spinal stenosis, neural foraminal encroachment or disc protrusion." T. 662. Dr. McGrory observed the fusion was "reasonably accomplished" and the screws were "not grossly loose." T. 591, 689. He prescribed Percocet and Soma. T. 591, 688-89.

Plaintiff visited Tallahassee Neurological Clinic for pain management on July 17. T. 867-68, 871-72. Albert S. Lee, M.D., prescribed Mobic, Soma, hydrocodone-acetaminophen, and Percocet. T. 867-68. He noted the straight leg raise was positive bilaterally and stated "I do not recommend any additional surgery on her lumbar spine, but entertain the possibility that she may have S1 joint pain that might benefit from minimally invasive sacroiliac instrumented fusion." T. 867. Approximately 10 days later, ARNP Julie Harris from Chipola Medical Associates discontinued Ambien and Soma. T. 1078-83.

On August 8, 2014, plaintiff informed Dr. Babatunde Adekola of Tallahassee Neurological Clinic she was hesitant about the spinal cord stimulator because "she does not want another foreign body in her body at this time." T. 864. She requested trigger point injections for upper back pain. T. 864. Her strength was +4/5 in the left hamstring muscles, and lumbar facet loading and Patrick's maneuver were positive bilaterally. T. 866, 869. Dr. Adekola diagnosed sacroilitis, muscle spasm, lumbar radiculopathy, and post-laminectomy syndrome (lumbar). T. 869-70. He administered trigger point injections to the upper back, scheduled bilateral SI injections, and indicated he would consider caudal epidural steroid injections for lumbar radiculopathy. T. 869-70. He also agreed to oversee plaintiff's opiate prescriptions, noting she was prescribed Percocet 5/325 every 6 hours as needed but was "taking 1-2 tablets daily," and substituted Tizanidine for Soma. T. 869.

Ms. Clark had bilateral S1 (sacroiliac) joint injections on August 15, 2014. T. 858. A couple of weeks later, ARNP Harris noted plaintiff was "on multiple controlled substances and she states she can't tell [if] any of them make any difference." T. 1073. ARNP Harris warned plaintiff about "the risk associated with her medications . . . including death. . . ." T. 1073. Plaintiff told ARNP Harris that "since she was here last month she has been able to stop her phenergan [nausea

medication], xanax, and soma and states she can't tell a difference with or without the medications." T. 1073. ARNP Harris noted plaintiff was "applying for disability and this is causing great stress. She states she can't not [sic] do a job where she stands all day but when I asked her about other jobs that may not require the labor intensive work she once did she stated she liked it at home and 'disability was the answer to all her problems'." T. 1073.

On September 3, 2014, Ms. Clark reported no improvement from the recent sacroiliac joint injections and little improvement from medication; she said she was taking Percocet "very infrequently" for that reason T. 859, 861. She said the trigger point injections helped her neck pain and requested more. T. 859. Ms. Clark also reported her pain was aggravated by "work activity including, but not limited to, prolonged computer work, prolonged sitting, standing, and walking." T. 859. Andrea Kimmel, CMA, noted paraspinal tenderness with increased muscle tone, multiple reproducible trigger points, increased tone of the gluteal muscles, SI joint tenderness, and diffuse tenderness of the sacral body and coccyx. T. 861. Kimmel administered 7 cervicothoracic trigger point injections and substituted Lyrica for gabapentin/Neurontin; Kimmel also discussed "home exercises and spinal stabilization." T. 862.

On September 10, 2014, Dr. Adekola administered a caudal epidural steroid injection for lumbosacral radiculopathy.  T. 857.  Plaintiff purportedly improved for one day but then had a "shooting pain down both of her legs." T. 851.  Approximately 3 weeks later, Dr. Adekola noted "mild to moderate distress from low back pain" with +4/5 strength in all lower extremity muscle groups, diminished sensation in the L5 distribution bilaterally, painful lumbar range of motion, lumbar paraspinal tenderness bilaterally, and a bilaterally positive lumbar facet loading test.  T. 853.  He prescribed Percocet twice a day as needed and noted plaintiff was taking Alprazolam for anxiety, Ambien for insomnia, and Lyrica for pain.  T. 853-54.  He advised of the "high risk of respiratory depression and death with concomitant use" of the 4 medications, and plaintiff indicated she understood.  T. 854.

Plaintiff reported low back and bilateral lower extremity pain on  October 8, 2014, rating it 8 out of 10.  T. 850.  Dr. Lee mentioned bilateral SI fusion but recommended plaintiff first have an MRI of the lumbar spine.  T. 850.  A September 30, 2014, drug test was negative, indicating plaintiff was not taking the prescribed oxycodone/Percocet.  T. 856.  Plaintiff reported "taking Percocet very rarely stating she has not had to fill a prescription in 3 months" and that the increased Lyrica dosage "helped greatly."  T. 1068.  She said she "still has chronic pain in [the] low

back but is able to control [it] with rest and rare use of pain meds." T. 1068. ARNP Harris noted plaintiff was applying for disability and is "convinced she is unable to work with her chronic back pain." T. 1068.

On October 28, 2014, Dr. McGrory noted diffuse tenderness of the paraspinal muscles from L4-S1 bilaterally and "[v]ery limited range of motion due to pain. Significant difficulty getting around the exam room today." T. 685. He also observed "lumbar weakness atrophy and loss of range of motion" due to failed back surgery syndrome and stated he "would not recommend further surgery." T. 685. He opined "she is totally disabled from meaningful employment due to back pain and limited range of motion nerve pain in her lower extremities. Her pain is a significant distraction to her and makes it very difficult to concentrate and perform functions and [sic] a normal capacity that would be required during most employment." T. 685.

Plaintiff returned to Dr. Adekola on November 4, 2014, for a refill of Percocet and Zanaflex and additional trigger point injections in her neck and upper back. T. 844. According to Dr. Adekola, plaintiff was in "mild to moderate distress from low back pain" with tenderness of the bilateral paracervical, posterior trapezius, infraspinatus and supraspinatus muscles and the left lattissimus dorsi chest muscle,

all of which were injected. T. 846. Dr. Adekola increased Percocet to 3 times a day as needed and renewed the prescription for Zanaflex. T. 846.

An MRI of the lumbar spine showed post-surgical fusion from L3 to S1 with an annular disc bulge at L3-4 with bilateral foraminal encroachment. T. 843. A December 1, 2014, EMG was normal, with no evidence of radiculopathy, but a Nerve Conduction Velocity test indicated bilateral carpal tunnel syndrome affecting the sensory fibers only; right ulnar neuropathy at the elbow, mild to moderate; and numbness of the feet and legs with the need to rule out small fiber neuropathy versus spinal stenosis. T. 838-42. Nine days later, plaintiff had a baseline weak radial pulse bilaterally, which extinguished with elevation of the arm bilaterally, left more than right. T. 836. Dr. Lee referred plaintiff for thoracic outlet syndrome evaluation. T. 836-37.

On December 22, during a visit to Chipola Medical Associates, plaintiff was instructed to "avoid taking Percocet." T. 1066. One week later, a CT of the lumbar spine showed significant erosion of the endplates of L4 and L5 and portions of the endplates of L3 and S1, with no evidence of sacroiliitis. T. 833, 836. Bilateral SI fusion was scheduled. T. 831-32. Plaintiff visited Tallahassee Memorial Hospital on January 23, 2015, due to severe left shoulder pain. Dr. John Jusino prescribed

Dilaudid.  T. 1250-57.  A few days later, Dr. McGrory completed insurance forms, in which he opined that, in an 8-hour workday, plaintiff could sit for a total of 2 hours, shifting positions at will, and neither stand nor walk due to "severe low back pain."  T. 792.  He said plaintiff would need to take unscheduled breaks to lie down, which could last from "hourly to all day," and would be absent more than 4 days a month.  T. 792.  He also said Ms. Clark could lift up to 5 pounds occasionally but nothing heavier due to a "[f]ailed lumbar fusion [and] painful spine/musculature."  T. 792-93.  In Dr. McGrory's view, plaintiff's reported pain was "intractable and virtually incapacitating" and increased by physical activity such that she would require "bedrest and/or medication," rendering her "unable to function at a productive level of work."  T. 791.

On February 10, 2015, Plaintiff returned to Dr. Adekola after learning the SI fusion would not be covered by insurance.  Dr. Adekola prescribed Percocet 3 times daily, Zanaflex, and Lidoderm patches.  T. 826-27.  He noted plaintiff's low back pain "remain[ed] consistent with bilateral sacroilitis."  T. 827.  Two days later, vascular surgeon Lawrence Kaelin, M.D., diagnosed thoracic outlet syndrome, noting markedly decreased blood pressure on the right arm compared to the left and significant outlet changes at 90 degrees on both sides, with some Raynaud's changes

in her hands with maneuvers and a positive outlet PVR.  T. 916.  Later the same day, Dr. Adekola administered bilateral SI joint injections.  T. 823.

A February 19, 2015, arch aortogram and subclavian angiography indicated markedly positive thoracic outlet syndrome symptoms, left worse than right.  T. 919-20.  By February 23, 2015, the SI pain of 7/10 had recurred, and plaintiff awaited insurer approval of SI fusion surgery.  T. 820-22.  Because of thoracic outlet syndrome, plaintiff had a left first rib resection and scalenectomy on March 12, 2015. T. 878-79, 1226-49.

Plaintiff returned to Chipola on March 30, 2015, reporting she attempted to exercise but had nerve pain and was taking Lyrica and Percocet.  T. 940.  On April 27, 2015, Ms. Clark sought treatment of a possible ankle sprain that occurred while she was "at the beach for a week" and "up and down" stairs.  T. 934; 1039-46.  Ms. Clark said her insurance would not approve SI surgery and that she was "suffering every day with pain" despite injections and medications and "ha[d] marked pain with standing in one location or even grocery shopping."  T. 934.  She said she was "worried about what to do now and . . . ha[d] no options on other treatment and . . . fe[lt] that she [was] suffering in the meantime and trying to deal with the pain" but

d[id] not limit her activities for the most part, although she ha[d] difficulty with "prolonged activities." T. 934.

On June 17, 2015, Dr. Adekola noted plaintiff was still waiting for insurance approval of the SI surgery and renewed her prescriptions for Percocet 3 times daily, Lyrica, Zanaflex, and Nambumetone, which provided "moderate" pain relief with a score of 5/10. T. 1085-87. Twelve days later, plaintiff reported increased back and bilateral leg pain, loss of bowel control, and 2 falls in the past 3 months. T. 1058. She continued to take Percocet 2 to 3 times daily, which was "helpful" but her pain increased to 10/10 at times. She said it was "more difficult to deal with the pain and [she] ha[d] been struggling[,] ha[d] not been able to do anything" and "staying in the pool because she d[id] not hurt when she [was] in [the] water[.]" T. 1058. She also said "she [was] scheduled to go to Tampa for 5 days, and [was] worried about trying to travel out of town." T. 1058. The doctor prescribed Prednisone. T. 1061.

On July 29, 2015, Dr. Adekola reevaluated plaintiff due to increasing radicular symptoms, 9/10 pain despite medications, right-sided weakness, and bladder and bowel incontinence. T. 1093. He found -4/5 bilateral leg strength and a slow gait. T. 1095. He requested further studies and increased Ms. Clark's Percocet dosage to

3 to 4 times daily for pain, to be continued with the other medications and Lidoderm patches.  T. 1095.

An August 12, 2015, MRI of the lumbar spine indicated annular bulging discs at L3-4, L4-5, and L5-S1 associated with minimal foraminal encroachment and minimal facet joint arthropathy.  T. 1097.  Two weeks later, claimant reported "travel to Tampa after her last visit" and that she "did well on the trip."  T. 1053.  On August 31, Dr. Lee detected giveaway weakness, possibly pain related, and opined plaintiff had a "neuropathic type pain pattern in both legs, right more than left" with no evidence of surgically correctable pathology.  He referred Ms. Clark to neurology and noted she was still on the waiting list for SI fusion approval.  T. 1100.

On September 10, 2015, Dr. Adekola prescribed a 3-month supply of Percocet for use 3 times daily.  T. 1104.  During an October 1, 2015, annual examination at Chipola, plaintiff reported chronic pain despite medications, which she was "spacing out."  T. 1048.  She was reminded not to mix Ambien with her other medications.  T. 1050-52.

Anne Struk, ARNP, examined plaintiff on October 23, 2015, due to neuropathic pain.  She noted a slow-paced gait with forward flexed posture, "give way strength" in both legs due to pain, and 4+/5 strength in the upper extremities.  T.

1113-14. A November 4, 2015, EMG of the lower extremities was normal. T. 1117.

Ms. Clark had normal strength but a slow-paced gait with forward flexed posture and

decreased sensation in the lower extremities on November 9. T. 1120. James True

Martin, M.D., diagnosed idiopathic neuropathy. T. 1120. Plaintiff presented to

Chipola on November 9, 2015, and reported the pain medication helped; she had side

effects but nevertheless had "to take a [t]ablet if she [went] anywhere[.]" T. 1194.

She also reported "good relief with trigger point injections in the past." T. 1194. On

November 18, 2015, plaintiff sought treatment at Tallahassee Memorial for severe

neck and left arm pain. Dr. Justin Simonds prescribed Dilaudid and prednisone. T.

1216-25.

A couple of weeks later, plaintiff saw Dr. Lawrence Kaelin for recurrence of

thoracic outlet syndrome on her left and continued worsening on the right, reporting

Lyrica was not helping. T. 1138. Dr. Kaelin noted some tightness to the left

supraclavicular area; the right side remained "fairly positive" and atrophy was

observed in the right hand. Dr. Kaelin recommended trigger point injections and

possible surgery." T. 1138.

On December 3, 2015, Dr. Adekola refilled Ms. Clark's medications and

administered trigger point injections. T. 1144-49. She reported the "[a]nalgesic

effect" of Percocet "to be very satisfactory." T. 1144. "Affect was reported as improved, [a]ctivity was reported as good, no [a]dverse effects noted per patient report." T. 1144. Ms. Clark had a steroid injection a few weeks later due to back pain. T. 1192. Susan Smith, A.P., noted Ms. Clark reported she "moderately limits activities and has been having worsening pain for the last 3 days . . . typically [in] the right leg," which Smith found "shocking" and described as "more persistent pain." T. 1189. On December 29, 2015, plaintiff presented at Jackson Hospital complaining of moderate back pain. She had a Dilaudid injection. T. 1155-60. The next day, Ms. Clark saw Dr. Adekola, reporting continued pain she rated 8/10 in severity despite medications. T. 1150-53. Dr. Adokola increased Percocet to 3 times daily. T. 1153.

In a September 1, 2016, declaration provided to the Appeals Council, plaintiff stated that when she took vacations in 2015 to the beach and Tampa, she traveled in the back seat and had to rest immediately upon arrival, staying indoors most of the day. T. 67. Regarding her August 27, 2014, conversation with ARNP Harris, Ms. Clark explained she was emotional, responding to ARNP Harris' comments, and informed ARNP Harris she preferred to be at home so she could take her pain medications and spend time in the bathtub or lying down and resting, which she could not do while driving or working. T. 67. Ms. Clark also said she did not "recall

saying that disability would be the answer to [her] problems" but rather that it was her "only manner of paying [her] bills." T. 67.

## ANALYSIS

1. Physicians' Opinions

    a. Dr. McGrory

Plaintiff claims the ALJ erred in giving little weight to Dr. McGrory's opinion she was limited to less than sedentary work. Dr. McGrory opined plaintiff could sit for 1 hour in an 8-hour work day and neither stand nor walk. T. 792. He found plaintiff "totally restricted and thus unable to function at a productive level of work." T. 791. The ALJ found these "functional limitations . . . too extreme when considering the claimant was able to return to work after both surgeries" and "without supportive findings and overly restrictive based on the objective medical evidence of record." T. 30.

Absent good cause, the opinions of a claimant's treating physician must be accorded considerable or substantial weight by the Commissioner. *See Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004); *Lewis*, 125 F.3d at 1440; *Broughton v. Heckler*, 776 F.2d 960, 960-61 (11th Cir. 1985); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986). "Good cause" exists when: (1) the treating

physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips,* 357 F.3d at 1241; *see also Lewis*, 125 F.3d at 1440 (citing cases). If a treating physician's opinion as to the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record, the ALJ is to give it controlling weight. *See* 20 C.F.R. § 404.1527(c)(2). Where a treating physician has merely made conclusory statements, however, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen,* 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant *controlling* weight, the ALJ nevertheless must weigh the medical opinion based on (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical impairments at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c).

Opinions on certain issues, such as a claimant's RFC and whether a claimant is disabled, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.*, that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d); *see* SSR 96-5p. Opinions reserved to the Commissioner, even when offered by a treating physician, are not entitled to controlling weight or special significance. *See* SSR 96-5p. "Giving controlling weight to such opinions . . . would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *Id.* Although a physician's opinions about what a claimant can still do or the claimant's restrictions may be relevant, therefore, such opinions are not determinative because the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. §§ 416.927(d), 416.945(a)(3), 416.946(c); SSR 96-5p.

"When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate [the] reasons." *Phillips*, 357 F.3d at 1241. Failure to do so is reversible error. *Lewis*, 125 F.3d at 1440 (*citing MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)). An ALJ may choose to accept some conclusions – or restrictions – within an opinion while rejecting others. If such a choice is made, in

addition to explaining the overall weight given to a particular medical opinion, the ALJ must explain "'with at least some measure of clarity the grounds for [a] decision'" to adopt particular aspects of a medical opinion. *Winschel v. Comm'r Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (*quoting Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984)). Failure to explain the rationale for crediting only certain aspects of an opinion will result in a reviewing court "declin[ing] to affirm 'simply because some rationale might have supported the ALJ's conclusion.'" *Id*.

In giving little weight to Dr. McGrory's opinion, the ALJ relied on plaintiff's testimony as well as the objective medical evidence of record. As the ALJ observed, although plaintiff testified she injured her back in 2010 when she fell into a paint can and had two surgeries, the latter surgery, a fusion, "was 'reasonably accomplished' and appeared to be quite solid with no obvious haloing of the S1 screws in December 2014." T. 28. The ALJ further observed that although Ms. Clark testified she stopped working because of lower back pain, "this is not consistent with the diagnostic imaging," which "showed no recurrent disc herniation or central canal stenosis, no significant scar tissue formation or foraminal encroachment with *minimal* facet joint arthropathy as of August 2015." T. 28. These findings are "consistent with

previous imaging including a [CT] scan in April 2014 and an MRI in November 2014," both of which "revealed no disc protrusion or stenosis." T. 28.

In January 2014, plaintiff had upper trapezius and paraspinous muscular tenderness, but free range of motion of the cervical and lumbar spine. T. 554. Her gait was normal for her age, and she did not use a mobility aid. T. 554-55. She had 5/5 strength in the upper and lower extremities. T. 555. In March 2014, Ms. Clark had 5/5 motor strength in both lower extremities, T. 595, and in July, she demonstrated normal active and passive ranges of motion, normal muscle tone, and normal bulk in all 4 extremities, T. 867. Gait testing was within normal limits. T. 867. In December, Ms. Clark demonstrated intact strength in both upper and lower extremities. T. 836. Her sensation was intact to light touch distally, and her gait again was within normal limits. T. 836.

In March 2015, Ms. Clark was diagnosed with thoracic outlet syndrome and underwent a left first rib resection and scalenectomy. T. 1228. A November 2015 EMG was normal for both lower extremities. T. 1117. An examination of Ms. Clark's back showed no lumbar, sacral, midline, or paraspinous spasm. T. 1158. Straight leg testing was negative, a pelvic examination was negative for swelling and

tenderness, and motor testing was negative for knee, ankle, and great toe deficits.  T. 1158.

As noted above, in September 2015, Ms. Clark reported the "[a]nalgesic effect" of Percocet was "very satisfactory'' with no adverse effects and "[a]ctivity was reported as good."  T. 1144.  In December 2015, she stated there was "appreciable low back pain reduction on her current analgesic regimen consisting of Percocet, Lyrica and Zanaflex."  T. 1144.  These reports, the ALJ observed, "contradict the claimant's testimony that Percocet relieves her pain but causes jittery and nauseous side effects that require her to lie down."  T. 28.  "Moreover, [claimant] testified that her surgeon recommended use of a cane but treatment records document she displayed a normal gait without the use of mobility aides on numerous occasions including the day before she sought emergent care for exacerbation of back pain on December 29, 2015."  T. 28.

The ALJ's decision to give little weight to Dr. McGrory's opinion is supported by substantial evidence in the record, including that cited by the ALJ.  Moreover, as the ALJ indicated, Dr. McGrory's opinion regarding Ms. Clark's inability to work is entitled to no special weight, as it regards a determination reserved to the Commissioner.

b.    Dr. Schmitter

Plaintiff also challenges the ALJ's decision to give significant weight to the opinions of Erick Schmitter, M.D., an orthopedic surgeon.  Dr. Schmitter submitted a medical source statement after the hearing in response to the ALJ's written interrogatories, opining plaintiff's impairments were "Post Laminectomy fusion syndrome: persistent pain of lumbar spine, but no documented neurologic deficit" and probable fibromyalgia. T. 1206.  Dr. Schmitter determined Ms. Clark's impairments did not meet a Listing due to "no documented neurologic deficit" and that Ms. Clark was capable of light exertional activity with occasional postural limitations.  T. 1206-14.

As recognized in the regulations, an ALJ "may . . . ask for medical evidence from expert medical sources" and "will consider this evidence . . . as appropriate." 20 C.F.R. § 404.1513a(b)(2).  Again, when considering medical opinions, the ALJ looks to (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical impairments at issue; and (6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(c).

Dr. Schmitter opined plaintiff could sit up to 7 hours and stand and walk 4 hours in an 8-hour work day, occasionally perform several postural activities, and frequently climb ramps or stairs but never climb ladders or scaffolds. T. 1210, 1212. The ALJ's decision to give substantial weight to Dr. Schmitter's opinion is supported by substantial evidence in the record. As both the ALJ and Dr. Schmitter observed, Ms. Clark had no documented neurologic deficits. T. 30, 1206. In November 2014, she had no focal neurological deficits. T. 1220. She had intact cranial nerves II through XII, normal sensory examination, normal motor strength, and normal coordination. T. 1220. The next month, she had intact strength in both upper and lower extremities, her sensation was intact to light touch distally, and her gait was within normal limits. T. 836. In January 2015, Ms. Clark demonstrated intact strength in the upper and lower extremities. T. 831. The following month, her cranial nerves were grossly intact, and she had normal extremity strength, intact sensation, a normal gait, and normal range of motion in the neck. T. 826. Given these facts, the ALJ did not err in giving substantial weight to Dr. Schmitter's opinions, as the ALJ's decision is supported by substantial evidence in the record.

c.    Dr. Mabry

State agency medical consultant R. James Mabry, M.D., opined in mid-2014 that Ms. Clark could engage in light exertional activity with occasional postural limitations.  T. 244-45.  He indicated plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; frequently climb ramps and stairs, and balance; and occasionally climb ladders, ropes, or scaffolds, stoop, kneel, crouch, and crawl.  T. 244-45.  He said plaintiff should avoid concentrated exposure to hazards, such as machinery and heights.  T. 246.  The ALJ afforded great weight to Dr. Mabry's opinion plaintiff could lift and carry at the light exertional level but found "less non-exertional limitations based on the medical signs and findings," a determination plaintiff contends is erroneous.  T. 29.

As recognized in the regulations, state agency medical and psychological consultants are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation."  *See* 20 C.F.R. § 404.1527(e)(2)(I).  Under the applicable law, an ALJ may rely upon, and must consider, the opinions of state agency consultants.  *See* 20 C.F.R. § 404.1527(e)(2); *see also Voronova v. Astrue*, 2012 WL 2384414, *4 (M.D. Fla. 2012)

(acknowledging the ALJ is required to consider opinions of non-examining state agency medical and psychological consultants). Specifically, although not bound by such opinions, the ALJ "must consider findings and other opinions of state agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether [claimant is] disabled. . . ." 20 C.F.R. § 404.1527(e)(2)(I).

When considering the findings of a state agency medical or psychological consultant, the ALJ will look to factors "such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. § 404.1527(e)(2)(ii). The ALJ determines the weight afforded to consultants and, if the ALJ affords controlling weight to such a consultant rather than to a treating source, the ALJ must explain the weight given the opinion, just as with other medical sources. *Id.; see Milner v. Barnhard*, 275 F. App'x. 947, 948 (11th Cir. 2008) (holding that, in a proper case, the ALJ does not err by giving substantial weight to the opinions of non-examining physicians, including state agency medical and psychological consultants).

Although Dr. Mabry did not examine Ms. Clark or review the entire record, the ALJ reviewed all the relevant evidence and gave great weight to Dr. Mabry's opinion plaintiff could lift and carry at the light exertional level, finding it consistent with the record as a whole. *See* 20 C.F.R. § 404.1527(c)(4); *Cooper v. Comm'r of Soc. Sec.*, 521 F. App'x 803, 807 (11th Cir. 2013); *Forrester v. Comm'r of Soc. Sec.*, 455 F. App'x 899, 902-03 (11th Cir. 2012); *see also* 20 C.F.R. § 404.1567(b) (defining light work). Plaintiff correctly points out that Dr. Mabry did not address thoracic outlet syndrome, an omission the ALJ did not acknowledge, but "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in [her] decision." *Dyer*, 395 F.3d at 1211. Moreover, there is no indication – or even suggestion – in the record that thoracic outlet syndrome precluded plaintiff from lifting and carrying at the light exertional level. Hence, even if the ALJ erred in giving substantial weight to Dr. Mabry's opinion without addressing the thoracic outlet syndrome omission, such error would be harmless, as the ALJ's decision to give great weight to Dr. Mabry's opinion otherwise is supported by substantial evidence in the record.

2.    Plaintiff's Credibility

Plaintiff also challenges the ALJ's credibility determination, arguing it was not supported by substantial evidence.  In rendering her decision, the ALJ found that although claimant's medically determinable impairments could reasonably be expected to cause "*some*" of her alleged symptoms, claimant's statements concerning the intensity, persistence, and functionally limiting effects of the symptoms were "not entirely consistent with the medical evidence and other evidence in the record."  T. 28.  The ALJ's reasons for discounting plaintiff's credibility are supported by substantial evidence in the record.

A claimant who attempts to prove disability based on subjective complaints must provide evidence of an underlying medical condition and either objective medical evidence confirming the severity of her alleged symptoms or evidence establishing her medical condition could reasonably be expected to give rise to the alleged symptoms.  *See* 20 C.F.R. §§ 404.1529(a), (b), 416.929(a), (b); SSR 96-7p; *Wilson*, 284 F.3d at 1225-26.  If the objective medical evidence does not confirm the severity of the claimant's alleged symptoms, but the claimant establishes she has an impairment that could reasonably be expected to produce the alleged symptoms, the ALJ must evaluate the intensity and persistence of the claimed symptoms and their

effect on claimant's ability to work. *See* 20 C.F.R. §§ 404.1529(c), (d), 416.929(c), (d); SSR 96-7p; *Wilson*, 284 F.3d at 1225-26. Notably, in determining on judicial review whether substantial evidence supports an ALJ's credibility determination, "[t]he question is not . . . whether [the] ALJ could have reasonably credited [claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

The undersigned cannot conclude the ALJ was clearly wrong in assessing plaintiff's credibility. Indeed, substantial evidence supports the ALJ's determination that plaintiff's statements regarding the intensity, persistence, and functionally limiting effects of her alleged symptoms were not fully credible. Although the medical findings may provide an objective basis for some of plaintiff's impairments and other symptoms, they do not reflect symptoms of disabling severity. Diagnoses alone do not establish work-related limitations; despite the complaints of pain, numerous x-rays, as well as other tests and examinations, came back essentially normal. In short, there is no objective confirmation in the record that plaintiff suffers from a condition that precludes her from working at the prescribed RFC. *See* 20 C.F.R. §§ 404.1529(c)(3), 404.1545(a)(3), 416.929(c)(3), 416.945(a)(3); SSR 96-6p;

SSR 96-7p; *T.R.C., ex rel. Boyd v. Comm'r, Soc. Sec. Admin.*, 553 F. App'x 914, 917-18 (11th Cir. 2014); *Cooper*, 521 F. App'x at 807.

Plaintiff's treatment history also calls her credibility into question. *See* 20 C.F.R. § 404.1529(c)(3)(iv)-(v). For example, although Ms. Clark testified her surgeon recommended she use a cane, the treatment records show she displayed a normal gait without use of an assistive device. T. 555, 1191, 1196. Further, as the ALJ observed, in October 2014, Ms. Clark reported rarely taking Percocet. T. 29, 1068. She said she still had chronic back pain but was able to control it with rest and the rare use of pain medication. T. 29, 1068. In September 2015, however, Ms. Clark reported the analgesic effect of Percocet was "very satisfactory" with no adverse effects. Tr. 1104. A few months later, she said there was "appreciable low back pain reduction" with her current medication. T. 1144. *See* 20 C.F.R. § 416.929(c)(3)(iv)-(v); *Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996). And when asked during an examination about working at a job that did not require her to stand all day, plaintiff responded that she liked being home and "disability was the answer to all her problems."[7] T. 1073. Finally, according to the medical records,

---

[7] Plaintiff challenges the ALJ's consideration of her statement regarding disability, pointing to a declaration she submitted to the Appeals Council after the ALJ issued her decision. That declaration was not before the ALJ when she rendered her decision in this case, and plaintiff has not requested remand for that reason. The declaration thus has no bearing on this matter.

despite allegations of disabling impairments, plaintiff visited the beach and went up and down stairs on one occasion; she also did well during a trip to Tampa. T. 934, 1053. She testified at the hearing, however, that she was not able to participate in family activities and vacations because she was required to stay in bed much of the time. Given the discrepancies in the evidence and plaintiff's testimony, the ALJ had ample reason to discount plaintiff's credibility.

## CONCLUSION

Although the record shows Ms. Clark suffers from impairments, she has not established that any such impairment renders her unable to work at the light exertional level, as the ALJ found. The Commissioner's decision is supported by substantial evidence in the record and application of the proper legal standards and thus should be affirmed.[8] *See Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").

---

[8] To the extent this court reviewed the legal principles upon which the ALJ's decision is based, it conducted a *de novo* review. *See Gilson v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

**ACCORDINGLY it is ORDERED:**

1.      The decision of the Commissioner is AFFIRMED and plaintiff's

application for Disability Insurance Benefits is DENIED.

2.      The clerk shall enter judgment for the defendant and close the file.

**DONE and ORDERED** this 7th day of August, 2018.


/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**